UNITED STATES of America ex rel. Rosbel DE LA FUENTE

v.

General J. M. SWING et al.

Civ. A. No. 931.

United States District Court
S. D. Texas, Brownsville Division.

Feb. 20, 1956.

Roy D. Buckley, Mission, Tex., for relator.

Malcolm R. Wilkey, U. S. Atty., Houston, Tex., Brian S. Odem, Asst. U. S. Atty., Brownsville, Tex., for respondents.

ALLRED, District Judge.

By an amended petition for writ of habeas corpus, de la Fuente seeks to be discharged from an order of the immigration authorities excluding him from admission to the United States and ordering him deported to Mexico.

De la Fuente, a citizen of Mexico by birth, entered the United States illegally in 1943 and worked in the Rio Grande Valley until 1949, except for short periods of time when he was permitted to return voluntarily to Mexico in lieu of deportation. He became engaged to marry a citizen of the United States in 1949 and returned to Mexico to secure proper papers for legal entry. On June 10, 1949, he presented himself for entry at Hidalgo, Texas, with a proper passport and public health clearance. He was interviewed by Charles L. Austin, an immigration inspector, who filled out a manifest according to information given under oath by petitioner, showing his destination as "Mexico via Hidalgo & McAllen to visit and shop one hour;" and a response to the question "Ever in the United States", in the negative. In the space, marked "Remarks and endorsements", appears the following:

"Applicant presents Mex. P. P. No. 3021–49 issued at Monterrey N. L. Mex. on 6/9/49 valid indef. (3) 2 Visa No. 6143 issued at Monterrey N. L. Mex. 6/9/49 valid 12 months with 257 form attached. Under oath and advised of the penalties of perjury (perjury defined) applicant denied that he had ever entered the U. S. or had ever been sent back to Mexico. Stated that he had never been granted a voluntary return in lieu of deportation. Apparently V. Departure Card of 9/14/45, file 3100 applies to subject."

The manifest was signed underneath the foregoing by Inspector Austin and by De la Fuente. The matter thereupon was referred to a Board of Special Inquiry and a definite date set for hearing. De la Fuente returned to Mexico and did not appear for such hearing. Instead he entered the United States illegally and married his sweetheart on July 5, 1949.

Thereafter, on November 3, 1949, de la Fuente again presented himself for legal entry at Hidalgo, presenting proper passport and documents, and, after having been placed under oath, before a Board of Special Inquiry, he was advised as to the statutory definition of perjury, 18 U.S.C.A. § 1621, and advised as to his right to have counsel, relatives or friends present. He waived such right. A manifest record prepared by Inspector Glasgow on November 3, 1949, was read to him and he stated that he had no corrections or additions to

make. He then testified under oath that he had married an American wife in Edinburg, Texas, on July 5, 1949; that he had never been legally admitted to the United States for permanent residence; that he had gone back to Mexico voluntarily, through Hidalgo twice. Upon being advised that the immigration records showed that he had been given permission to depart voluntarily three times, (September 14, 1945, March 28, 1946 and June 3, 1947) de la Fuente stated that this was probably right; that he had first entered the United States illegally in 1943 and had worked in the Valley continuously from 1943 to 1949, except for temporary periods of time when he was given permission to depart from the United States voluntarily in lieu of deportation; that he had not registered for the military service because he had heard that one illegally in the United States could not register. Thereupon he was advised that the records of the immigration office indicated that on June 10, 1949, he had applied for admission to go to McAllen and shop for one hour and had sworn at such time that he had never been in the United States; that such records also showed that, after being advised of the definition of perjury, he had denied that he had ever entered the United States or had ever been sent back to Mexico and had stated that he had never been given a voluntary return in lieu of deportation. Petitioner then answered, "Yes, but I lied at the time" (referring to June 10, 1949); that he had not returned for the hearing before the Board of Special Inquiry because he was going to get married and his friends induced him to say that he had never been in the United States; that he reentered the United States illegally and got married; that he realized he was to blame "for I am not a child;" that his friends told him that if he ever had a record in the office he couldn't get a card; that this was the reason he denied it; that on June 10, 1949, he actually was coming to the United States to get married

"in order to stay in the United States;" that he had told the primary inspector that he had never been in the United States because he was induced to do so by his friends and was anxious to get married; that he recalled the definition of "perjury", as it had been explained to him before the board. Considering all of the facts in the case in the light of the definition of perjury, petitioner admitted that he had committed perjury before the primary inspector June 10, 1949, in swearing that he had never been in the United States and had never been given permission to depart voluntarily in lieu of deportation. He stated that the requirements for a local crossing card were less than those required for a passport to live in the United States and for that reason he secured the local crossing card first in order to get married; that he thought it would be easier to continue residence in the United States and secure the proper papers to remain here after he was married.

In response to the question: "Why didn't you tell the primary inspector on June 10, 1949, that you were going to get married," de la Fuente answered: "I started out lying at the American Consulate because I was afraid I would be denied a card to come to the United States and I kept on lying about being in the United States. I did not tell the inspector I was going to get married because I asked for a permit to go and come back. I thought I would get it."

The Board of Special Inquiry found that petitioner had admitted the commission of a felony involving moral turpitude, to-wit, perjury, before the primary inspector on June 10, 1949, in regard to his previous illegal residence in the United States and concluded, as a matter of law, that he was subject to exclusion in accordance with Section 3, of the Immigration Act of February 5, 1917,[1] as a person who admits the commission of a felony involving moral turpitude, to-wit, perjury. He was there-

1. Now 8 U.S.C.A. § 1182(a) (9).

upon excluded. The exclusion order was appealed and affirmed by the Acting Commissioner of the Immigration Service and the appeal was dismissed by the Board of Immigration Appeals.

Thereafter, on March 16, 1954, petitioner was given a deportation hearing at Hidalgo, Texas, where he was represented by counsel of record. He was charged with the offence of entry into the United States at a place not designated by the Act of June 27, 1952, 8 U.S.C.A. § 1101 et seq. During that hearing an additional charge was lodged against him; that he was a person who admits having committed a crime involving moral turpitude, to-wit, perjury. This order was likewise appealed and dismissed by the Board of Immigration Appeals on December 20, 1954. This habeas corpus proceeding ensued.

De la Fuente's contention here is that he did not speak English; that he had only about three years in a primary school in Mexico; that he did not understand Inspector Austin on June 10, 1949 because of the long and uncommon words used; that he thought the inspector meant had he ever come across the border with another card; that the inspector was angry and he was afraid to come back; that he understood the inspector meant had he ever passed over the bridge at Hidalgo.

■■ It is true that the proceeding before the inspector was in Spanish and that de la Fuente had little formal schooling, but the later proceeding before the Board of Special Inquiry in November 1949 was fairly conducted and there is no claim that the translations were incorrect. At that time perjury was defined to petitioner and after such definition he stated that he had lied to the inspector because he wanted to come over and get married and remain in the United States and he was afraid if he admitted that he previously had been permitted voluntarily to depart in lieu of deportation, that he would not be allowed to enter for the purpose of getting married. Irrespective of his understanding of the legal definition of perjury, these free admissions show that de la Fuente knew he was under oath before Inspector Austin, knew that it was wrong to lie deliberately for the fraudulent purpose of securing permission to enter the United States and get married; that, realizing that he had lied under oath and that the records would show that he had so lied, he failed to appear before the earlier Board of Special Inquiry. These admissions of fact show a conscious commission of the crime of perjury, the essential elements of which are: (1) the taking of an oath in a case where a law of the United States authorizes an oath to be administered; (2) to testify truly; (3) willfully and contrary to such oath making a false statement; (4) as to a material fact; and (5) which he did not believe to be true.

■ In my opinion it is not necessary for a witness to understand the *legal* definition of perjury. An ordinary witness who testifies voluntarily in court would hardly be heard to defend on the ground that he did not understand the *legal* definition. It is enough that he understand that he is under oath to tell the truth and, with such knowledge, willfully or corruptly testifies falsely to any material matter. De la Fuente's statements before the Board of Special Inquiry as to why he did so testify before Inspector Austin shows a conscious realization on his part that it was *material* (whether he would be able to express it in that language or not) in that he feared that if he told the truth about it he would not be permitted to come in and get married. His testimony before this court that he understood the inspector was asking him if he had ever come across the border with another card is not convincing since he freely admitted before the Board that he had testified falsely before Austin that he had never been in the United States before and had never been permitted to depart voluntarily.

Petitioner's counsel emphasizes on brief that Inspector Austin did not define perjury in the primary inspection of June 10, 1949. The inspector testified that he could not remember whether he read over and translated the form definition of perjury but that he did define perjury to the extent that he believed petitioner would understand; and that he did explain the *penalty* for perjury. But, in any event, it is immaterial whether Austin defined the crime of perjury on June 10, 1949. It was defined to petitioner at the hearing before the Board of Special Inquiry and petitioner stated that he then understood it and admitted that he had committed the crime of perjury. This was a legal conclusion on his part. But, in addition he admitted *facts* before the Board that show as a matter of law that he was guilty of perjury before. Inspector Austin, to-wit: (1) that he was sworn to testify truly on June 10, 1949 by Austin; (2) that he then testified falsely that he never had been in the United States before and never had been permitted to depart voluntarily from the United States in lieu of deportation; (3) that he knew this testimony to be false at the time he gave it, therefore could not have believed it to be true; and (4) that such false testimony was given knowingly and willfully because he wanted to get into the United States legally to get married and believed, if he told the truth, he would not be admitted. The evidence, in addition to his admissions before the board, is overwhelming to show that petitioner did commit perjury before Inspector Austin.

The result indeed is tragic since petitioner now has not only a wife but two children born in the United States; but the statute under which the immigration authorities acted 8 U.S.C.A. § 136 (e), (now 8 U.S.C.A. § 1182(a) (9)), provides that an alien *shall be excluded* who has been convicted or admits committing a crime involving moral turpitude. The writ of habeas corpus will be denied. The Clerk will notify counsel to submit an order accordingly.